## UNITED STATES DSICTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

FELICIA RUTLEDGE,

     Plaintiff,

v.

WASHTENAW COUNTY, THE
WASHTENAW COUNTY SHERIFF'S
OFFICE, ALYSHIA DYER, MATTHEW
HARSHBERGER, and JEREMIAH
RICHARDSON,

     Defendants.

Case No.

Hon.

_____

Joseph X. Michaels (P79084)
Adam M. Taub (P78334)
CROSON, TAUB, & MICHAELS, PLLC.
Attorney for Plaintiff
455 E. Eisenhower Pkwy, Suite 75
Ann Arbor, MI 48108
(734) 519-0875
jmichaels@ctmlawyers.com
ataub@ctmlawyers.com

_____

## PLAINTIFF'S COMPLAINT AND JURY DEMAND

Plaintiff, FELICIA RUTLEDGE by and through her attorneys, CROSON,

TAUB, & MICHAELS, PLLC., hereby alleges as follows:

## INTRODCUTION

1

1.      Plaintiff Felicia Rutledge (hereinafter "Ms. Rutledge") brings this action pursuant to 42 U.S.C. § 1981 to remedy constitutional violations and race discrimination related to her public employment under federal law, as well as violations of Michigan's Whistleblower Protection Act ("WPA"), MCL § 15.361 *et seq.,* the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.1101 *et seq.,* and Michigan Common Law.

2.      Ms. Rutledge is an African American female and a former dedicated employee of the Defendant Washtenaw County Sheriff's Office (hereinafter "WCSO") who served as one of the oldest and most experienced staff members at WCSO. Ms. Rutledge diligently performed her duties and was well respected across WCSO, the County, and in the law enforcement community.

3.      However, after Defendant Alyshia Dyer assumed office as Washtenaw County Sheriff, she and the other Defendants began a targeted pattern of retaliation and discrimination directed at Plaintiff due to her race, age, and repeated opposition to potential violations of law committed by Defendant Dyer and her direct reports. This termination was a part of an ongoing pattern of retaliation and termination of long-term civil servants, many of whom were older African Americans such as Ms. Rutledge, and many of whom, on information and belief, may have also raised issues of wrongdoing at the WCSO. Ultimately, many of these employees, including Plaintiff, were replaced by a younger, white employee.

2

4.     Specifically, on multiple occasions Defendant Dyer, along with her Undersheriff, Defendant Matthew Harshbereger, and her Head of Training and Human Resources, Defendant Jeremiah Richardson, directed WCSO staff, including Ms. Rutledge to hire individuals preferred by Defendant Dyer notwithstanding the requirements of the Michigan Commission on Law Enforcement Standards Act, MCL § 28.601. In violation of that law, Sheriff Dyer hired or attempted to hire multiple individuals who simply were not legally qualified to perform the duties of their positions.

5.     Plaintiff repeatedly—and strenuously—opposed these illegal hiring practices, viewing a core part of her responsibilities as ensuring the officers Washtenaw County hired were qualified and legally able to serve the citizens of the County. However, rather than address these concerns and apply the applicable legal hiring standards, Defendants conspired to retaliate against Plaintiff, instituting a sham "investigation" that went on for months and uncovered absolutely nothing of substance. Despite the outcome of this "investigation," Defendants still moved forward with terminating Plaintiff's employment. While Defendants maintained that Plaintiff was terminated because of her job performance, no issue regarding her performance had even been raised prior to her complaints of unlawful hiring practices.

6. This termination also violated an express agreement between Ms. Rutledge and the WCSO that she could only be terminated for "cause." Nothing identified by Defendant Dyer would support a finding of "cause" for her termination as that term is understood. Indeed, as set forth below, the real reason for Ms. Rutledge's termination was her race and her complaints of wrongdoing; the reason stated by Defendants were merely a pretext to conceal this fact.

## PARTIES AND JURISDICTION

7. Plaintiff Felicia Rutledge is an individual residing in Wayne County, Michigan.

8. Defendant Washtenaw County is a governmental organization created under the laws of the State of Michigan, and exercising governmental control throughout Washtenaw County.

9. Defendant Washtenaw County Sherrif's Office is a governmental organization created under the laws of the State of Michigan, and exercising governmental control throughout Washtenaw County.

10. Defendant Alyshia Dyer is the elected Sheriff of Washtenaw County and currently serves in that capacity. On information and belief, she resides in Washtenaw County.

4

11.     Defendant Matthew Harshbereger is the appointed Undersheriff of Washtenaw County and currently serves in that capacity. On information and belief, he resides in Washtenaw County.

12.     Defendant Jeremiah Richardson is an employee of Washtenaw County and currently serves in that capacity. On information and belief, he resides in Washtenaw County.

13.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 as this case arises under federal law, namely the Fourteenth Amendment to the U.S. Constitution. 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

14.     Jurisdiction over supplemental state law claims is proper under 28 U.S.C. § 1367 as they arise from the same case and controversy.

15.     Venue is proper in this Court under 28 U.S.C. § 1391(b) as this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTUAL ALLEGATIONS

### A.     *Background information*

16.     Plaintiff Felicia Rutledge (hereinafter "Plaintiff or Ms. Rutledge") is a former employee of Defendant Washtenaw County. She is a dedicated and experienced human resources professional with decades of municipal and governmental experience.

5

17.    Ms. Rutledge started with the County in April 2022 as an Administrative Operations Coordinator.

18.    Throughout her tenure under the previous Sheriff, Ms. Rutledge consistently received positive performance appraisals and commendations. She loved her work and enjoyed the chance to serve the citizens of Washtenaw County.

19.    As Administrative Operations Coordinator, Ms. Rutledge's position was not an at-will position, but subject only to discipline through "just cause."

20.    In December 2024, the Washtenaw County Board of Commissioners resolved to identify those positions that were political appointees and thus not subject to "just cause" termination and did not include Administrative Operations Coordinator—Ms. Rutledge's position.

21.    Ms. Rutledge worked under this policy, which was expressly agreed to by the parties, that she could not be terminated without cause.

22.    Indeed, the employee handbook provided to Ms. Rutledge reflects this agreement stating, "Probationary Employees may be dismissed with or without cause during their probationary period. ***All other dismissals are for cause.***" (Exhibit A) (emphasis added)

23.    Ms. Rutledge, who is 54, was at all relevant times to this suit, the oldest employee in the Sheriff's Human Resources Department.

6

24.     Notably, part of Ms. Rutledge's duties was to ensure that job candidates met the standards articulated by any relevant state or federal law or Washtenaw County policy.

25.     Specifically, this meant ensuring that law enforcement officers met the mandatory eligibility criteria set forth in the Michigan Commission on Law Enforcement Standards Act ("MCOLESA"), MCL § 28.601, *et seq*.

26.     Under MCOLSEA, the Michigan Commission on Law Enforcement ("MCOLES") enforces the licensing requirements for law enforcement officers serving in Michigan.

27.     To receive certification under MCOLESA, an applicant must pass a thorough vetting performed by the hiring law enforcement agency. This ensures that law enforcement officers in Michigan are highly trained, competent, and suitable for the rigorous demands of law enforcement work.

28.     Specifically, MCOLESA requires that officers pass a rigorous licensing exam assessing, *inter alia,* physical ability, psychological fitness, education, reading and writing skills, and fitness of character. MCL §§ 28.609(2)(b)-(l).

29.     And of particular relevance, while MCOLES sets the various standards under the statute, local law enforcement agencies themselves are tasked with screening and attesting to MCOLES that an employee has met the required standards. MCL § 28.602(j) specifically requires that before MCOLES can make a

determination on licensure, the law enforcement agency must "attest[] to the commission that the individual complied with the licensing standards." *See also* MCL § 28.609(3)(a).

30.     Similarly, for corrections officers who were to work in the County's jail, such candidates needed to meet the minimum eligibility criteria in the Local Corrections Officers Training Act ("LCOTA"), MCL § 791.531 *et seq.*, and the standards set forth by the Michigan Sheriff's Coordinating and Training Council ("MSCTC"), which was created by that Act.

31.     Similar to law enforcement officers, corrections officers must meet the minimum standards issued by MSCTC, including a physical aptitude test, mental fitness exam, and criminal record check. *See* https://www.misctc.org/standards.html

32.     Similar to the process for law enforcement officers, local governments employing corrections officers "[have] the responsibility to screen candidates to ensure compliance with all minimum standards." *Id.* They therefore must screen candidates and attest to MSCTC their fitness for the roles for which candidates are hired. MCL § 791.543.

33.     Ms. Rutledge's job included ensuring that screening was conducted and that candidates met the minimum standards for both law enforcement and corrections officers' positions. And she was required to attest to candidates' suitability to the appropriate regulatory bodies.

**B.**     *After Defendant Dyer is elected sheriff, Defendants ask Plaintiff to push through unqualified applicants in violation of law*

34.     After the November 2024 election, Defendant Alyshia Dyer became the new Washtenaw County Sheriff, making her the County's highest-ranking law enforcement official.

35.     As the WCSO oversees both sworn deputies and corrections officers, Defendant Dyer personally and the WCSO *writ large* were required to comply with the requirements of MCOLESA and LOCTA.

36.     However, almost immediately after taking office, Defendants Dyer, Harshberger, and Richardson began ignoring the requirements of those statutes in order to hire and promote their preferred candidates.

37.     Plaintiff repeatedly complained and opposed these practices and reported such illegal practices to her superiors at the Washtenaw County Sherrif's Office at numerous points over the following months.

38.     Specifically, on or about January 8, 2025, Defendant Dyer attempted to reinstate a deputy that had previously been demoted as being untruthful for cheating on a credentialing exam. Under the prior administration, he was demoted to a dispatch position.

39.     Ms. Rutledge was directed via email by the newly appointed HR/Training Manager Defendant Richardson (who is, on information and belief,

Sherrif Dyer's former romantic partner), to reinstate this individual immediately and to make a new identification card for him.

40. Ms. Rutledge knew that the candidate's substantiated finding of dishonesty would disqualify the individual from serving as a Sheriff's deputy, as the MSCTC required individuals to be of "good moral character."

41. Ms. Rutledge, after receiving this request, spoke with Defendant Richardson. She relayed that returning the candidate to deputy was a violation of MCOLESA.

42. Defendant Richardson simply replied, "this is the directive" and reinstated the individual to deputy status.

43. This was not an isolated incident. Over the next several months, the pattern persisted. In February, Defendant Dyer attempted to hire an applicant who had a prior personal protective order ("PPO") against him and then later impermissibly brought his gun to work at his previous federal job.

44. Ms. Rutledge again spoke to Defendant Richardson and stated that this candidate—given his background—was also not able to pass MCOLES' licensing requirements.

45. Defendant Richardson would not hear it; he instead directed this applicant to be moved forward to conditional job offer status, notwithstanding his background check issues.

10

46. Again, in February, Ms. Rutledge was directed to process an applicant who had previously been disqualified from hiring in 2024.

47. This candidate had an extensive criminal history, including being booked into the Washtenaw County Jail 8 eight times from 1995 to 2013, as well as recent infractions, including a bench warrant issued in 2024, a misdemeanor for selling liquor without a license, and other infractions.

48. The candidate also failed to report financial issues and did not provide dates or details about PPOs granted against him by two different women.

49. Unsurprisingly, the background investigators recommended that this candidate not move forward in the process.

50. Ms. Rutledge raised this issue with Defendant Richardson and reiterated that the applicant would not pass MCOLES/MSCTC screening. Defendant Richardson again instructed her to rout this individual for a conditional job offer.

51. In the meeting with Defendant Richardson in which Ms. Rutledge learned that this individual would be offered a conditional job offer, Ms. Rutledge immediately opposed this hiring, as the candidate was not qualified for the position due to their long rap sheet, obvious issues of truthfulness, among many other issues.

52. Ms. Rutledge was adamant this hiring did not comply with the requirements of MCOLES, and there was no way the County could attest that the candidate possessed the requisite moral character for the job for which he was hired.

11

53.     Defendant Richardson persisted and demanded the candidate be pushed through. Indeed, even after the background check report was received, Defendants directed Plaintiff to continue moving forward with a conditional job offer.

54.     Ms. Rutledge also raised the issue with the background investigator directly, who indicated she had been directed by Defendants Dyer and Harshberger to revise the completed background investigation and change the candidate's status to approval.

55.     On March 12, 2025, Plaintiff lodged a formal complaint via email to Defendant Richardson to express her concerns regarding the HR department, which included a complaint that management was "giving directives that are against policy."

56.     Ms. Rutledge was referring to the issues that she had been raising for several months: Defendants were pushing candidates who should not be hired under established policy and law.

57.     In that same email, Ms. Rutledge requested a meeting to discuss the matter and stated that the HR staff were losing productivity and morale.

58.     Rather than address the issue, Defendant Richardson immediately began retaliating against Ms. Rutledge. He began using an extremely aggressive tone in emails and nitpicking her work—down to rewriting emails sent to potential applicants and reprimanding her for who she included in a cc line.

12

59.     Defendant Richardson would also enter Ms. Rutledge's office while she was speaking to a colleague, interrupt the conversation to address the colleague directly, and disregard Mr. Rutledge entirely.

60.     In one instance, Defendant Richardson came into Ms. Rutledge's office and verbally intimidated her—expressly stating that he intended his communications to be hostile—purposefully within earshot of other employees.

61.     Ms. Rutledge immediately complained and reported the interaction to the Director of Operations who stated she would inform Defendant Harshberger. However, nothing was done about Defendant Richardson's conduct.

62.     In April, Defendant Richardson hinted at further retaliation, telling Plaintiff that disciplinary action against Plaintiff was "being considered" because Defendant Dyer was "upset" over an incident where—apparently—someone had not received a Zoom link.

63.     Even after her written complaint to HR, higher-ups kept pushing through candidates who were not qualified for law enforcement positions.

64.     In March, an applicant failed a psychological evaluation. Such a failed psychological examination would mean—in the normal course of business—that the applicant would be disqualified on that basis and could not be considered further for the position.

65.     However, Defendant Richardson demanded that the candidate be given a second test—something that Ms. Rutledge had never seen done before.

66.     Ms. Rutledge inquired with a colleague as to how to handle the situation. The colleague stated that for a second test, the WCSO needed to give the second evaluator the first evaluator's findings and records, so they could assess if they disagreed with the assessment.

67.     In contravention of this practice, Defendant Richardson directly ordered Ms. Rutledge not to inform the second doctor of the first doctor's opinion. The candidate would thus get a second bite at the apple, allowing them to retake the test, and the second evaluator could not question them about their responses in the first examination—because he or she would have no knowledge of it.

68.     Yet again, in March, Defendant Dyer attempted to push through two candidates without giving them the required medical exams claiming they were not "necessary for their roles," maintaining they were "hybrid" civilian positions.

69.     Ms. Rutledge had never heard of this exemption. Under County policy, all applicants were to receive this standard testing, which again was being inconsistently applied in this case.

70.     MCOLA and the standards applied by the MSCTC apply to all "local corrections officers," under the Act, and do not have an exception for "hybrid" positions. MCL § 791.538.

14

71.     In April, rather than provide transparency or follow established policy, Defendants revoked the access of HR individuals—including Ms. Rutledge—from the system in which they could see background investigation results, preventing them reviewing such results.

72.     Despite making it impossible for HR staff to verify such information, Defendants *still* directed them to attest that applicants had passed the required screenings to MCOLEA.

73.     Ms. Rutledge again complained to Defendant Richardson, flatly stating that she could not attest to a candidate's fitness if she did not even know that the individual had passed the required screenings. Defendant Richardson did nothing to correct this clear legal issue and continued his course of conduct.

74.     In April 2025, the County received a request under the Freedom of Information Act, ("FOIA") MCL 15.231 *et seq.* related to the candidate hired with a significant criminal history. *See* ¶¶ 40–48, *supra*.

75.     Two employees that Ms. Rutledge supervised in the Records Department approached her in her office and stated that Defendant Richardson had instructed them to improperly redact information that was responsive to the FOIA request and not covered by an exemption.

15

76.     This was a clear violation of the County's obligations to provide records to the public under FOIA and could subject the County to liability and civil fines. *See* MCL § 15.240(7).

77.     Ms. Rutledge immediately reported this violation of law to Defendant Harshberger. She told him the information she had learned from her direct reports and that it was against the law to withhold this information.

78.     The day after Ms. Rutledge's report of FOIA violation, Defendant Richardson came into her office upset asking "did you call the Undersheriff on me."

79.     Defendant Richardson indicated in a raised voice that he was extremely upset that Ms. Rutledge reported the suspected violation and told her that her subordinates should not have even come to her in the first place.

80.     Ms. Rutledge explained that she felt she had a duty to inform the Undersheriff of the issue and further stated that employees should be free to contact her about any issues in the workplace—as she was an HR representative with an open-door policy.

81.     The issue with candidate screenings again surfaced in an HR staff meeting on April 30, 2025, with Defendant Richardson present.

82.     In that meeting, Ms. Rutledge and a colleague raised their compliance concerns with the failure to follow MCOLESA and LCOTA standards.

16

83. Defendant Richardson replied that any applicant that he, Defendant Dyer or the Defendant Harshberger approved should be treated as having "passed"—regardless of the results of the actual background check.

84. Defendant Richardson stated that the only role of HR staff was to enter the information directed by superiors into the system and that failure to do so could result in discipline.

85. Ms. Rutledge again raised her previous concern that entering information into the MCOLES system or to the MSCTC is a formal attestation that an applicant met all the required criteria and that falsifying such information due to the direction of supervisor without verification would violate State law.

86. Ms. Rutledge further specifically stated that the policy of passing unqualified applicants could expose employees individually and the County as a whole to substantial liability.

87. Mr. Richardson would not hear it. He reiterated her only role in the process was to follow directives from higher ups as to whether they wanted to "pass" an applicant through the process.

88. In July, the candidate with a lengthy criminal history was listed in the system as denied for receiving a final job offer (FJO"), most likely because he had failed his required background check.

17

89.     However, later that day, Ms. Rutledge observed that this applicant was switched to "approved"

90.     Ms. Rutledge later learned that this individual was approved despite his failed background check.

91.     Ms. Rutledge again complained to Defendant Richardson about the discrepancy. Mr. Richardson again did nothing as a result of her complaint.

92.     Even after access to application materials was restricted, the issues continued. In September, Defendant Richardson approved a candidate under the name of Defendant Harshbarger—which was a falsification of records—and also approved the candidacy of an employee who failed a drug test.

93.     Ms. Rutledge informed Defendant Harshberger of the falsified record in his name, and said he responded that he would look into the matter.

94.     Again, Defendant Richardson confronted Ms. Rutledge in her office, demanding to know why she had contacted the Undersheriff regarding the issue. Defendant Richardson instructed her not to communicate with Undersheriff any longer.

  **C.** *As a Result of Plaintiff's Complaints, and Her Race, Ms. Rutledge Is Subject to a Meritless Investigation and Termination.*

18

95.     As a result of these complaints, on November 6, 2025, Ms. Rutledge was placed on administrative leave with pay. Ms. Rutledge was not informed of the charges against her or given any information regarding her suspension.

96.     After several months of suspension, without knowing the charges against her, Ms. Rutledge finally received a notice of the charges on or about February 25, 2026.

97.     The charges were without merit. After three months of investigation, Defendants identified issues, some as old as 2023, none of which amounted to anything of substance, let alone cause for termination.

98.     Ms. Rutledge responded to these charges as required by policy and attended a hearing in front of Sheriff Dyer on March 12, 2026.

99.     Following this hearing, Defendant Dyer proceeded to terminate Ms. Rutledge effective March 23, 2026.

100.    The reasons stated in the investigation report are false and a mere pretext to obscure the real reason for Ms. Rutledge's termination: her repeated complaints of suspected violations of law, her race, and her age.

101.    Ms. Rutledge's termination was a pattern of termination of African American employees at WCSO. On information and belief, Ms. Rutledge is one of five different African American individuals terminated by Defendant Dyer's administration in the past year.

19

102.   Following her termination, Ms. Rutledge's position was filled with a significantly younger, white employee.

## CAUSES OF ACTION

### COUNT I
### RACE DISCRIMINATION IN CONTRACTING
### 42 U.S.C. § 1981
### *(Against all Defendants)*

103.   Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

104.   By the conduct described above, Defendants intentionally deprived Plaintiff, who is African American, of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual employment relationship with Defendant in violation of 42 U.S.C. 1981.

105.   As a result of Defendants' deprivation of Plaintiff's contractual rights, Defendants subjected Plaintiff to adverse employment actions, up to and including termination.

106.   Defendant's actions were motivated by unlawful discrimination against Plaintiff because of her race and age.

107.   But for Plaintiff's race or age, Defendant would not have terminated her.

108.   Defendants' actions constituted unlawful discrimination on the basis of race and age in violation of MCL 37.2202(1)(a).

20

109. Defendant's course of conduct was done with reckless disregard for Plaintiff's federally protected civil rights, entitling Plaintiff to unlimited punitive damages.

110. As a result of Defendant's unlawful conduct, Plaintiff was harmed and continues to be harmed in that he has suffered economic and non-economic loss, including but not limited to lost wages, damage to professional reputation, emotional distress, outrage, and humiliation.

## COUNT II
## ELLIOTT-LARSEN CIVIL RIGHTS ACT – RACE AND AGE DISCRIMINATION
## M.C.L. 37.2202(1)(a)
### *(Against all Defendants)*

111. Plaintiff incorporates the foregoing paragraphs as if fully restated herein.

112. At all relevant times, Defendants were employers and Plaintiff was an employee covered by and within the meaning of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101.

113. Plaintiff is a member of a protected group because of her race (Black/African American) and age (54).

114. Defendants subjected Plaintiff to adverse employment actions, up to and including termination.

115. Defendant's actions were motivated by unlawful discrimination against Plaintiff because of her race and age.

21

116. But for Plaintiff's race or age, Defendant would not have terminated her.

117. Defendants' actions constituted unlawful discrimination on the basis of race and age in violation of MCL 37.2202(1)(a).

118. As a result of Defendants' unlawful conduct, Plaintiff was harmed and continues to be harmed in that she has suffered economic and non-economic loss, including but not limited to lost wages, damage to professional reputation, emotional distress, outrage, and humiliation.

**COUNT III**
**RETALIATION IN VIOLATION OF**
**THE WHISTLEBLOWERS' PROTECTION ACT**
**MCL § 15.362**
*(Against all Defendants)*

119. Plaintiff incorporates by reference all preceding paragraphs.

120. At all relevant times, Plaintiff was an employee, and Defendants were employers covered by and within the meaning of the Whistleblower's Protection Act. MCL §§ 15.361(a)-(b).

121. Individual Defendants at all relevant times were "employer[s]" as they acted as agents of Defendant Washtenaw County. MCL § 15.361 (b).

122. As described herein, Plaintiff repeatedly made complaints of violations of law or reasonably suspected violations of law to employees of Defendant Washtenaw County.

123. Defendant Washtenaw County, and members, agents and employees, constitute a "Public Body" under the WPA, MCL § 15.361(d)(iii).

124. All of Plaintiff's complaints of violations of law or reasonably suspected violations of law were made in good faith.

125. Defendants subjected Plaintiff to adverse employment actions, up to and including termination.

126. Defendants' actions were motivated by unlawful retaliation against Plaintiff because of her reports of violations of law or suspected violations of law, in violation of MCL § 15.362.

127. But for Plaintiff's reports of violations of law or suspected violations of law Defendants would not have terminated Plaintiff's employment.

128. As a direct and proximate result of Defendants' violation of the Whistleblower's Protection Act, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

129. As a direct and proximate result of Defendants' violation of the Whistleblower's Protection Act, Plaintiff has suffered emotional injury, feelings of depression, emotional and physical distress, mental and physical anguish, loss of

23

reputation, humiliation and embarrassment, and the physical effects associated therewith, and will so suffer in the future.

### COUNT IV
### BREACH OF CONTRACT
### Michigan Common Law
### *(Against County Defendants)*

130. Plaintiff incorporates by reference all preceding paragraphs.

131. Plaintiff and Defendants Washtenaw County entered into an employment relationship, which was created by express agreement between the parties.

132. This agreement was supported by consideration. In accordance with the agreement, Ms. Rutledge provided services for the County, and the County compensated her for such work on the terms and conditions

133. In this relationship, the parties specifically agreed that Ms. Rutledge could only be dismissed for "cause."

134. In the employee handbook governing her relationship, the County agreed that "Probationary Employees may be dismissed with or without cause during their probationary period. ***All other dismissals are for cause.***" (Exhibit A) (emphasis added)

135. "Cause" or "just cause" is a legal term of art, which is understood to alter an at-will employment relationship, to mean an individual may be terminated only for misconduct or other sufficient reason.

136. Defendants breached this agreement by terminating Plaintiff without sufficient cause on March 23, 2026.

137. As a direct and proximate result of Defendants' breach of contract, Plaintiff has been placed in financial distress and has suffered a loss of earnings and benefits and will so suffer in the future; she has been required to employ the services of an attorney to bring this lawsuit and will suffer additional damages in the future.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Felicia Rutledge requests the following relief from this Court against Defendants:

    a.    Compensatory damages for monetary and nonmonetary loss in whatever amount she is found to be entitled;

    b.    Exemplary and punitive damages in whatever amount she is found to be entitled;

    c.    A judgment for lost wages and benefits, past and future, in whatever amount she is found to be entitled;

    d.    An order of this Court reinstating Plaintiff to the positions she would have if there had been no wrongdoing by Defendants;

e.      An injunction of this Court prohibiting any further unconstitutional

or illegal acts by Defendants;

f.      An award of interest, costs and reasonable attorney fees; and

g.      Whatever other equitable relief this Court may find appropriate

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment

against Defendants and all relief requested in this Complaint.

> Respectfully Submitted,
> Croson, Taub, & Michaels, PLLC
>
> /s/ Joseph X. Michaels____
> Joseph X. Michaels (P79084)
> Attorney for Plaintiff
> 455 E. Eisenhower Pkwy, Suite 75
> Ann Arbor, MI 48108
> (734) 519-0872
> jmichaels@ctmlawyers.com

Dated: June 2, 2026

**UNITED STATES DSICTRICT COURT
EASTERN DISTRICT OF MICHIGAN**

FELICIA RUTLEDGE,

     Plaintiff,                            Case No.

                                         Hon.

v.

WASHTENAW COUNTY, THE
WASHTENAW COUNTY SHERIFF'S
OFFICE, ALYSHIA DYER, MATTHEW
HARSHBERGER, and JEREMIAH
RICHARDSON,

     Defendants.

_____

Joseph X. Michaels (P79084)
Adam M. Taub (P78334)
CROSON, TAUB, & MICHAELS, PLLC.
Attorney for Plaintiff
455 E. Eisenhower Pkwy, Suite 75
Ann Arbor, MI 48108
(734) 519-0875
jmichaels@ctmlawyers.com
ataub@ctmlawyers.com

_____

**PLAINTIFF'S JURY DEMAND**

NOW COMES Plaintiff, Felicia Rutledge, by and through her attorneys, Croson,

Taub, & Michaels, PLLC. and hereby demands a jury trial in the above-captioned

matter.

27

/s/ Joseph X. Michaels_____
Joseph X. Michaels (P79084)
Attorney for Plaintiff
455 E. Eisenhower Pkwy, Suite 75
Ann Arbor, MI 48108
(734) 519-0872
jmichaels@ctmlawyers.com

Dated:  June 2, 2026